06-178

FILED by    *EG*    D.C.
ELECTRONIC

**Dec 8 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.O. OF FLA. · MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: **05-22545-CIV-MORENO/SIMONTON**

JAVIER TABOADA,

      Plaintiff,

v.

MEDTRONIC, INC., a Minnesota Corporation
for profit; and MEDTRONIC USA, INC.,
a Minnesota Corporation for profit,

      Defendants.

_____/

## NOTICE OF FILING SECOND AMENDED COMPLAINT

Plaintiff hereby submits the proposed Second Amended Complaint in support of his

Motion for Leave to File a Second Amended Complaint.

          Respectfully submitted,

          ALEX ALVAREZ, P.A.
          Attorney for Plaintiff
          355 Palermo Avenue
          Coral Gables, FL 33134
          Telephone: (305) 444-7675
          Facsimile: (305) 444-0075
          Email: alex@integrityforjustice.com

SCANNED
FEB 14 2006
U.S. DISTRICT COURT MPLS

BY:    s/  ALEX ALVAREZ
        Florida Bar No. 946346

Certified to be a true and
correct copy of the document on file
Clarence Maddox, Clerk.
U.S. District Court
Southern District of Florida
by _____ Deputy Clerk
Date 2/7/06

37/bs

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed to DIGNA B. FRENCH, ESQ., Digna B. French, P.A., Alvin B. Davis, P.A., STEEL, HECTOR & DAVIS, LLP., 200 So. Biscayne Blvd., Suite 4000, Miami, FL 33131 and GREENBERG TRAURIG, Lori G. Cohen, The Forum, 3290 Northside Parkway, Suite 400, Atlanta, GA 30327, this 8th day of December, 2005.

BY:   s/ALEX ALVAREZ
      Florida Bar No. 946346

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: **05-22545-CIV-MORENO/SIMONTON**

JAVIER TABOADA,

      Plaintiff,

v.

MEDTRONIC, INC., a Minnesota Corporation
for profit; and MEDTRONIC USA, INC.,
a Minnesota Corporation for profit,

      Defendants.

_____/

## SECOND AMENDED COMPLAINT FOR DAMAGES

Plaintiff, JAVIER TABOADA, sues Defendants, MEDTRONIC, INC. a Minnesota Corporation for Profit and MEDTRONIC USA, INC., a Minnesota Corporation for Profit, and alleges:

### *Parties*

1.    At all times material, Plaintiff, JAVIER TABOADA, was and is a citizen of Broward County, Florida.

2.    Defendant, Medtronic, Inc., is a corporation incorporated under the laws of Minnesota with its principal place of business in that state which manufactured, designed, tested, and provided labeling for certain heart defibrillators known as implantable cardioverter defibrillators (ICD) and cardiac resynchronization therapy defibrillators (CRT-D). Defendant, Medtronic, Inc., conducts business throughout the United States and further is registered to do business in the state of Florida, directly and indirectly through its agents and distributors to such an extent that it avails itself of the jurisdiction of this court.

- 1 -

3.      At all times material, Defendant Medtronic, Inc., was and is in the business of designing, producing, manufacturing, distributing, marketing and selling of heart defibrillators known as implantable cardioverter defibrillators (ICD) and cardiac resynchronization therapy defibrillators (CRT-D) to the public.

4.      Defendant, Medtronic USA, Inc., is a corporation incorporated under the laws of Minnesota with its principal place of business in the State of Florida within this District. As a subsidiary of Medtronic, Inc., Medtronic USA, Inc. is directly involved in the distribution of Medtronic ICDs and CRT-Ds throughout the State of Florida and Latin America. As represented by Medtronic, Inc. on its website, Medtronic USA, Inc. is located at 2700 South Commerce Parkway, Suite 105 Weston, Florida 33331. Defendants, Medtronic, Inc. and Medtronic USA, Inc., jointly and collectively transact business out of both Medtronic USA, Inc.'s Weston, Florida headquarters. Defendant, Medtronic USA, conducts business throughout the United States and further is registered to do business in the state of Florida, directly and indirectly through its agents and distributors to such an extent that it avails itself of the jurisdiction of this court.

5.      Defendants, Medtronic, Inc. and Medtronic USA, Inc., share many of the same officers and directors and have had a unity of interest in ownership sufficient to make them indistinguishable (hereinafter, Medtronic and Medtronic USA will be referred to as "Defendant" or "Medtronic").

### *Jurisdiction and Venue*

6.      The matter in controversy exceeds $75,000, exclusive of interest and costs, as specified by 28 U.S.C. § 1332.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), as Plaintiff obtained, purchased and used the medical device, known as implantable cardioverter

- 2 -

defibrillators (ICD) and cardiac resynchronization therapy defibrillators (CRT-D) that forms the basis of this lawsuit in Southern Federal District of Florida, at all relevant times, Plaintiff resided within this District, the injury sued upon occurred in this District and Defendants marketed, advertised, sold and distributed the implantable cardiac defibrillator in this District.

8.      At all times relevant hereto, Medtronic was engaged in the business of manufacturing, marketing, promoting, selling and/or distributing implantable cardioverter defibrillators (ICD) and cardiac resynchronization therapy defibrillators (CRT-D).

9.      Medtronic placed these implantable cardioverter defibrillators (ICD) and cardiac resynchronization therapy defibrillators (CRT-D) into the stream of interstate and worldwide commerce including from Medtronic USA, Inc.'s headquarters in Westin, Florida which is located within this District within the State of Florida.

10.     Defendant Medtronic is registered and licensed to do business in the state of Florida.

11.     At all relevant times, Defendant transacted, solicited, and conducted business in the state of Florida, including from Defendant, Medtronic USA, Inc.'s headquarters located within this District, and is hence venue is appropriate in this District and Defendant is subject to the jurisdiction of this court.

### *Allegations Common to All Counts*

12.     Defendant manufactured, designed, tested, and provided labeling for certain heart defibrillators known as implantable cardioverter defibrillators (ICD) and cardiac resynchronization therapy defibrillators (CRT-D) (hereinafter referred to collectively as the "Defective Devices"), under the brand names:

- 3 -

(a)     MARQUIS VR, Model 7230

(b)     MARQUIS DR, Model 7274

(c)     MAXIMO VR, Model 7232

(d)     MAXIMO DR, Model 7278

(e)     INSYNC MARQUIS, Model 7277

(f)     INSYNC II MARQUIS, Model 7289

(g)     INSYNC III MARQUIS, Model 7279

(h)     MICRO JEWEL II, Model 7223CX

(i)     GEM DR, Model 7271

13.     The Defibrillators are surgically implanted in patients who have a type of heart disease that creates the risk of sudden cardiac failure or a life-threatening heart arrhythmia (abnormal rhythm). Their purpose is to provide electrical pulses to the heart in the event of heart failure, and certain devices also provide continuous cardiac heart pacing to maintain patients' normal heart rhythm. The Defibrillators were sold to hospitals and physicians for implantation in patients to shock or pace the heart into normal rhythm if the user suffers a rapid, life-threatening heart rhythm disturbance.

14.     The Defibrillators are all operated by a battery, which is contained within the implanted device. For a period of time believed to extend from November 1996 to December 1997, May 1997 to August 1998, and April 2001 to December 2003, Medtronic placed a defective battery in one or more of these Defective Devices. The battery has been known to experience unpredictable loss of power without warning in some units.

15.     On April 16, 2004, Medtronic announced that it was recalling two heart Defibrillators because they had been linked to at least four deaths and one injury. Medtronic said that Medtronic Micro Jewel II Model 7223Cx and the Medtronic GEM DR Model 7271 failed to

- 4 -

charge properly. About 1,800 of these Defective Devices are thought to be still in use. Medtronic publicly stated that with the suspect Defibrillators, the capacitors may take longer than normal to charge near the end of the battery service life and could cause a delay in delivery or non-delivery of shock therapy. A delay or non-delivery of shock therapy can be life threatening.

16. The U.S. Food and Drug Administration ("FDA") has been apprised of the defibrillator recall and has classified this action as a Class I recall. The FDA defines a Class I recall as a situation in which there is reasonable probability that the use of or exposure to the product will cause serious adverse health consequences or death.

17. In February 2005, Defendant disclosed to physicians and to the FDA the further existence of defective batteries, in more and multiple models of its Defibrillators. Medtronic was aware of the existence of these defective batteries for a long period of time before it made this disclosure. In Medtronic's February 2005 statement to physicians, Medtronic stated that the battery shorting problem can cause the batteries in these Defective Devices to become rapidly depleted, sometimes within hours or days. After the battery is depleted, the device will no longer function.

18 On information and belief, at no time prior to the April 2004 and February 2005 recall, did Medtronic notify any doctors or patients about the reported problems and failures of the affected Defibrillators, its findings regarding the affected Medtronic Defibrillators, or its alteration in the manufacturing process for the affected Medtronic Defibrillators.

19. Plaintiff had no knowledge or reason to acquire such knowledge prior to Medtronic's announcements in April 2004 and February 2005.

20. The said Defective Devices are installed inside the body surgically. ICD devices

- 5 -

shock or pace the heart into normal rhythm in the event of the user suffering a rapid, life-threatening heart rhythm disturbance. These heart rhythm disturbances can lead to sudden cardiac arrest. The CRT-D devices provide electrical pulses to the heart in event of heart failure symptoms.

21.    The said Defective Devices have in common that they are all operated by a battery which is contained within the implanted device.

22.    For a period of time believed to extend from April 2001- December 2003, Defendant placed a defective battery in these devices. These batteries are subject to rapid charge depletion due to a shorting of the battery, which leads sudden, unpredictable loss of power without warning in some units.

23    At all times relevant to this action, Defendant knew and/or had reason to know that the Defective Devices were not safe for the patients for whom they were prescribed and implanted. The Defective Devices contain a defective battery that causes shorting and an unpredictable loss of power without warning.

24.    As a result of this defective design and manufacture, Defendant's Defective Devices can cause serious physical trauma, injury and/or death. Defendant knew or had reason to know of his tendency and the resulting risk of injury and death, preventing the Plaintiff, and their health care providers, from making informed choices about the implantation of the Defective Devices.

25.    On or about July 9, 2004, Plaintiff, JAVIER TABOADA, had a Medtronic Marquis DR 7274 (hereinafter referred to collectively as the "Plaintiff's Defective Device"), surgically placed in his body.

26.    Plaintiff, JAVIER TABOADA, has been unable pay for the medical expenses

- 6 -

related to the removal of the Plaintiff's Defective Device.

## Count I
### Negligence Claim Against Medtronic

Plaintiff readopts and re-alleges paragraphs 1 through 26 as though fully set forth herein and further alleges:

27.     At all times material Plaintiff used Plaintiff's Defective Device for its intended purpose and as directed.

28.     At all times material Defendant undertook activities to aggressively advertise and market Plaintiff's Defective Device to physicians and sell it to the public.

29.     Defendant owed Plaintiff a duty, before Plaintiff's Defective Device was sold on the market, to disclose the inherent and potential hazards of implanting Plaintiff's Defective Device, which the Defendant knew or through the exercise of reasonable care should have known.

30.     Defendant as designer, producer, manufacturer, distributor, marketer and seller of Plaintiff's Defective Device, owed Plaintiff a duty to exercise reasonable care, including but not limited to exercising reasonable care as follows:

    a.     designing Plaintiff's Defective Device in a manner in which it would be reasonably safe so that, when administered and used as intended, it would not cause injury or death;

    b.     manufacturing Plaintiff's Defective Device free of reasonable defects or dangerous propensities;

    c.     inspecting and testing Plaintiff's Defective Device to ensure that it is reasonably safe and free of defects,

    d.     adequately testing Plaintiff's Defective Device;

    e.     adequately warning of Plaintiff's Defective Device's known dangerous propensities;

- 7 -

    f.     monitoring Plaintiff's Defective Device and its uses in the scientific, medical community and general population;

    g.    warning of any known health hazards or dangers associated with the use of Plaintiff's Defective Device;

    h.    using reasonable care in designing, manufacturing, testing, monitoring, distributing and selling of Plaintiff's Defective Device, in both the pre-marketing and marketing stages;

    i.     warning of any health hazards or dangers associated with the use of Plaintiff's Defective Device discovered in the post marketing period; and

    j.     timely revising the drug labeling to include warnings as soon as there was reasonable evidence of an association of a serious hazard with Plaintiff's Defective Device.

31.    Defendant, as designer, producer, manufacturer, distributor, marketer and seller of Plaintiff's Defective Device, acting through its employees, agents, and/or representatives, breached its duties owed to Plaintiff and was further negligent in any and all of the following particulars, but not limited thereto:

    a.    failing to design Plaintiff's Defective Device in a manner in which it would be reasonably safe so that, when administered and used as intended, it would not cause injury or death;

    b.    failing to manufacture Plaintiff's Defective Device free of reasonable defects or dangerous propensities;

    c.    failing to inspect and test Plaintiff's Defective Device to ensure that it is reasonably safe and free of defects;

    d.    failing to adequately test Plaintiff's Defective Device;

    e.    failing to adequately warn of Plaintiff's Defective Device's known dangerous propensities:

    f.     failing to monitor Plaintiff's Defective Device and its uses in the scientific, medical community and general population;

    g.    failing to warn of any health hazards or dangers associated with the use of Plaintiff's Defective Device;

    h.    failing to use reasonable care in designing, manufacturing, testing,

- 8 -

monitoring, distributing and selling of Plaintiff's Defective Device;

i.     failing to timely warn of any health hazards or dangers associated with the use of Plaintiff's Defective Device discovered in the post marketing period;

j.     failing to timely revise the drug labeling to include warnings as soon as there was reasonable evidence of an association of a serious hazard with Plaintiff's Defective Device;

k.     by designing, manufacturing, testing, monitoring, distributing, labeling and selling of Plaintiff's Defective Device, which Defendant knew or through the exercise of reasonable care and diligence should have known was dangerous or unreasonably dangerous and carried with it significant risk of injuries to its users.

l.     failing to disclose and/or actively suppressing information that Plaintiff's Defective Device caused statistically was defective and dangerous;

m.     failing to disclose and/or actively suppressing that there had been insufficient or biased studies regarding the safety of Plaintiff's Defective Device before it was first distributed;

n.     failing to disclose and/or actively suppressing that Plaintiff's Defective Device was not fully and adequately tested;

32.     Defendant was further negligent in manufacturing the Plaintiff's Defective Device

in the following ways:

a.     the manufacturing processes for the defibrillators and certain of their components did not satisfy the Food and Drug Administration's Pre-Market Approval standards for the devices;

b.     the failure of the manufacturing processes for the defibrillators and certain of their components to satisfy the Food and Drug Administration's Pre-Market Approval standards for the devices resulted in unreasonably dangerous manufacturing defects, and

c.     Defendant concealed the defects from the FDA, from physicians, and from the patients who were to receive the devices

d.     Defendant failed to warn of the unreasonable risks created by these manufacturing defects.

- 9 -

33.    Although the Food and Drug Administration's Pre-Marketing Approval process imposed requirements on the Defendants in connection with the manufacture and marketing of Medtronic defibrillators, it did not impose specific health or safety requirements on the device itself.

34.    Defendant knew or should have reasonably foreseen that its negligent acts and/or omissions would cause injury or death to the public, including the Plaintiff.

35.    Plaintiff, through his physician, justifiably relied on Defendant's marketing and assurances of the safety of Plaintiff's Defective Device and such reliance caused Plaintiff's injury.

36.    As a result, Plaintiff suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of the ability to earn money and aggravation of a previously existing condition.    These losses are either permanent or continuing in nature, and Plaintiff will suffer these losses in the future.

**WHEREFORE,** Plaintiff sues Defendant and demands judgment for compensatory damages in excess of the minimal jurisdictional limits of this court, prejudgment and post judgment interest as allowed by law, costs and demands trial by jury of all issues so triable.

### *Count II*
### *Strict Liability Claim Against Medtronic*

Plaintiff readopts and re-alleges paragraphs 1 through 26 as though fully set forth herein and further alleges:

37.    At all times material Defendant, was in the business of selling, designing, manufacturing and or distributing, *inter alia,* pharmaceutical products including Plaintiff's

- 10 -

Defective Device for sale to the general public and to the Plaintiff.

38.    Defendant knew that Plaintiff's Defective Device would be used and was used without inspection for defects by the Plaintiff.

39.    Defendant placed Plaintiff's Defective Device in the general stream of commerce where it was eventually consumed and used by the Plaintiff.

40.    Plaintiff's Defective Device was defectively designed and/or manufactured because its use resulted in a substantial and unreasonable likelihood of causing injuries, which rendered Plaintiff's Defective Device unreasonably dangerous for its intended use.

41.    Plaintiff's Defective Device was and is far more dangerous than an ordinary consumer would expect and was unsuitable for its intended use.

42.    Plaintiff was unaware of the dangerous propensities and defective condition of Plaintiff's Defective Device.

43.    The Plaintiff's Defective Device consumed and used by Plaintiff was in the same condition as when it left the Defendant's control and custody.

44.    Defendant could have reasonably foreseen or reasonably anticipated that Plaintiff's Defective Device, in a defective condition, would injure the Plaintiff.

45.    When Plaintiff received the Plaintiff's Defective Device it was unreasonably dangerous because it was dangerous to an extent beyond that which would be contemplated by the ordinary recipient who possessed ordinary knowledge common to the Plaintiff's community as to its characteristics.

46.    As a result, Plaintiff suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of the ability to

- 11 -

earn money and aggravation of a previously existing condition.    These losses are either permanent or continuing in nature, and Plaintiff will suffer these losses in the future.

**WHEREFORE**, Plaintiff sues Defendant and demands judgment for compensatory damages in excess of the minimal jurisdictional limits of this court, prejudgment and post judgment interest as allowed by law, costs and demands trial by jury of all issues so triable.

### *Count III*
### *Breach of Warranty of Fitness For Specific Purpose*
### *Claim Against Medtronic*

Plaintiff readopts and re-alleges paragraphs 1 through 26 as though fully set forth herein and further alleges:

47.    Defendant warranted that the Plaintiff's Defective Device received by the Plaintiff was fit for the purpose for which it was used.

48.    Plaintiff and/or Plaintiff's healthcare provider relied upon the skill and judgment of the Defendant to produce a safe medical device (Plaintiff's Defective Device) and to provide appropriate information regarding precautions for the use and implantation of Plaintiff's Defective Device.

49.    Defendant further warranted that Plaintiff's Defective Device was fit for the purpose for which it was used when its agents and/or employees:

        a.    were physically present in the operating room during the implantation surgery;

        b.    assisted Plaintiff's healthcare provider in performing the surgical procedure;

        c.    tested and calibrated Plaintiff's Defective Device immediately prior to and after implantation in the Plaintiff;

        d.    continued to test, calibrate, and monitor Plaintiff's Defective Device during Plaintiff's recovery period and follow-up visits.

- 12 -

50.    The Defendant breached the warranty that the Plaintiff's Defective Device received by the Plaintiff was fit for the purpose for which it was used.

51.    As a result, Plaintiff suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of the ability to earn money and aggravation of a previously existing condition.    These losses are either permanent or continuing in nature, and Plaintiff will suffer these losses in the future.

**WHEREFORE**, Plaintiff sues Defendant and demands judgment for compensatory damages in excess of the minimal jurisdictional limits of this court, prejudgment and post judgment interest as allowed by law, costs and demands trial by jury of all issues so triable.

### *Count IV*
### *Breach of Implied/Express Warranties*
### *Claim Against Medtronic.*

Plaintiff readopts and re-alleges paragraphs 1 through 26 as though fully set forth herein and further alleges:

52.    At all times material the Defendant marketed, distributed and sold Plaintiff's Defective Device for use by the Plaintiff and further actively solicited healthcare providers to prescribe Plaintiff's Defective Device, and the Defendant knew of the use for which the Plaintiff's Defective Device was intended and impliedly warranted it would be of merchantable quality and would be safe and fit for its intended use and purpose.

53.    Defendant further expressly and impliedly warranted that Plaintiff's Defective Device was of merchantable quality and would be safe and fit for its intended use and purpose when its agents and/or employees:

- 13 -

    a.    were physically present in the operating room during the implantation surgery;

    b.    assisted Plaintiff's healthcare provider in performing the surgical procedure;

    c.    tested and calibrated Plaintiff's Defective Device immediately prior to and after implantation in the Plaintiff;

    d.    continued to test, calibrate, and monitor Plaintiff's Defective Device during Plaintiff's recovery period and follow-up visits.

54.    Contrary to the Defendant's implied warranty, Plaintiff's Defective Device was neither of merchantable quality nor safe and fit for its intended use and purpose. Plaintiff's Defective Device was and is unreasonably dangerous and unfit for the ordinary purpose for which it was prescribed.

55.    As a result, Plaintiff suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of the ability to earn money and aggravation of a previously existing condition. These losses are either permanent or continuing in nature, and Plaintiff will suffer these losses in the future.

**WHEREFORE**, Plaintiff sues Defendant and demands judgment for compensatory damages in excess of the minimal jurisdictional limits of this court, prejudgment and post judgment interest as allowed by law, costs and demands trial by jury of all issues so triable.

### *Count V*
### *Florida's Deceptive & Unfair Trade Practices Act ("FDUTPA")*

Plaintiff readopts and re-alleges paragraphs 1 through 26 as though fully set forth herein and further alleges:

56.    Defendants' actions are deceptive and in clear violation of FDUTPA, entitling Plaintiff to damages and relief under Fla. Stat. §§ 501.201-213.

57.    Plaintiff was a consumer within the meaning of FDUTPA, who was deceptively

- 14 -

and unlawfully induced to purchase and/or have Plaintiff's Defective Device implanted in his body.

58.     Florida Statutes, Section 501.204 makes unfair and/or deceptive trade practices in the conduct of any trade or commerce illegal.

59.     Florida Statutes, Section 501.211 creates a private right of action for individuals who are aggrieved by an unfair and/or deceptive trade practice by another person.

60.     Florida Statutes, Section 501.2105 provides that the prevailing party in litigation arising from a cause of action pursuant to Chapter 501 shall be entitled to recover attorney's fees within the limitations set forth therein from the non prevailing party.

61.     Florida Statutes, Section 501.213 provides that any remedies available under Chapter 501 are in addition to any other remedies otherwise available for the same conduct under state or local law.

62.     Florida Statutes, Section 501.203 (3)(c) states that a person has violated the Florida Deceptive and Unfair Trade Practices Act if he violates "any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices."

63.     Defendants engaged in the practice of manufacturing, marketing, distributing, selling and otherwise placing into the stream of commerce a defective product and/or device which it knew or should have known was defective which constitutes trade and commerce as defined by Sections 501.203(8) Fla. Stat., and is therefore subject to FDUTPA.

64.     Defendants' acts constitute unconscionable, deceptive, or unfair acts or practices in violation of FDUTPA.

65.     As a result of Defendants' unfair and deceptive trade practices, in violation of the FDUTPA, Plaintiff is entitled to actual damages resulting from the purchase of the Defective

Defibrillator

66.    As a result of Defendants' unfair and deceptive trade practices, in violation of the FDUTPA, Plaintiff is entitled to an award of attorney's fees and court costs, if he prevails.

**WHEREFORE**, Plaintiff sues Defendants and demands judgment for actual damages in excess of the minimal jurisdictional limits of this court, prejudgment and post judgment interest as allowed by law, attorney's fees and court costs, and demands trial by jury of all issues so triable.

DATED this ____ day of _____, 2005.

ALEX ALVAREZ, P.A.
Attorney for Plaintiff
355 Palermo Avenue
Coral Gables, FL  33134
Telephone: (305) 444-7675
Facsimile:  (305) 444-0075
Email: alex@integrityforjustice.com


BY: _____
ALEX ALVAREZ
Florida Bar No. 946346


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed to DIGNA B. FRENCH, ESQ., Digna B. French, P.A., Alvin B. Davis, P.A., STEEL, HECTOR & DAVIS, LLP., 200 So. Biscayne Blvd., Suite 4000, Miami, FL  33131 and GREENBERG TRAURIG, Lori G. Cohen, The Forum, 3290 Northside Parkway, Suite 400, Atlanta, GA 30327, this ____ day of _____, 2005.


BY: _____
ALEX ALVAREZ
Florida Bar No. 946346

- 16 -